## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| STEPHANIE HOOVER, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | **CASE NO. 1:22-cv-06723** |
| Plaintiff, | ) | |
| v. | ) | **Honorable Edmond E. Chang** |
| | ) | |
| CWGS GROUP, LLC | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Stephanie Hoover ("Plaintiff") individually and on behalf of all others similarly situated, through her undersigned counsel, hereby alleges the following against Defendant CWGS Group, LLC d/b/a/ Camping World and Good Sam ("CWGS" or "Defendant"). Facts pertaining to Plaintiff and her personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon information and belief, *inter alia*, the investigation of Plaintiff's counsel.

## NATURE OF THE ACTION

1.      This is a class action for damages with respect to CWGS for its failure to exercise reasonable care in securing and safeguarding sensitive consumer data—including first and last names, Social Security numbers (SSNs), driver's license numbers, passport numbers, financial account numbers, financial account access information, passwords, digital signatures, and credit or debit card information (collectively defined herein as "PII" or "Private Information").

2.      Plaintiff brings this action on behalf of similarly situated current and former CWGS employees and consumers whose sensitive Private Information was stolen by cybercriminals in a cyber-attack on CWGS's systems that took place in or around January to February of 2022 and

1

which resulted in the access and exfiltration of sensitive private Information (the "Data Breach" or "Breach").

3. CWGS did not send notice of the Data Breach to Plaintiff and members of the putative "Class" (defined below) until in or around November 2022, approximately ten months from the occurrence of the Breach.

4. As a result of the Data Breach and CWGS's failure to promptly notify Plaintiff and Class Members thereof, Plaintiff and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private Information in the coming years, including but not limited to, unauthorized credit card charges, unauthorized access to email accounts, tax fraud, and identity theft.

5. There has been no assurance offered by CWGS that all impacted Private Information or copies thereof have been recovered or destroyed.

6. Accordingly, Plaintiff asserts claims for negligence, breach of implied contract, breach of fiduciary duty, and declaratory and injunctive relief.

## PARTIES

### A. Plaintiff Stephanie Hoover

7. Plaintiff Stephanie Hoover is a resident and citizen of Harrisburg, Pennsylvania, and brings this action in her individual capacity and on behalf of all others similarly situated.

8. Plaintiff purchased a recreational vehicle ("RV") from Grumbine's RV, a Harrisburg based RV retailer, in 2001. To obtain a loan for this RV, she was required to disclose her Private Information, which was then maintained by Gumbine's RV.

9. Grumbine's RV was later acquired by CWGS, which operates a Camping World RV retail store at the same location. CWGS continued to maintain Plaintiff's Private Information for years.

10. In maintaining her Private Information, CWGS expressly and impliedly promised to safeguard it. CWGS, however, failed to implement proper, industry-standard safeguards to protect such Private Information, leading to its exposure and exfiltration by cybercriminals. These cybercriminals stole Plaintiff's Private Information with the intent to sell it and/or fraudulently misuse it for their own gain.

11. In November of 2022, Plaintiff received a letter from CWGS, asserting that her personal information had been released in the Data Breach.

12. Plaintiff and Class Members have faced, and will continue to face, a certainly impending and substantial risk of future harms because of CWGS's ineffective data security measures, as further set forth herein. Some of these harms will include fraudulent charges, targeted advertising without their consent, and fraudulent applications for benefits in their names, leading to Class Members being denied necessary loans or benefits in the future.

13. Plaintiff Hoover greatly values her privacy. She would not have purchased the RV had she known her Private Information would be negligently maintained as it was.

**B.    Defendant CWGS**

14. CWGS is a Delaware limited liability company, specializing in RVs and outdoor recreation retailing. It has its principal place of business at 250 Parkway Dr. Lincolnshire, IL 60069. Its corporate policies, including those on data privacy, are established in and emanate from the State of Illinois.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

16.     This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District and the computer systems implicated in this Data Breach are likely based in this District. Further, Defendant is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of its businesses in this District, including decisions regarding the security measures to protect its customers' PII. By promoting, selling and marketing its products and services from Illinois to thousands of consumers nationwide, Defendant intentionally avails itself of this jurisdiction.

17.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the Data Breach; Defendant's principal place of business is located in this district; Defendant maintains Class Members' PII in this District; and Defendant caused harm to Class Members residing in this District.

## **FACUAL ALLEGATIONS**

### *Defendant's Business*

18.     Defendant CWGS, incorporated in Delaware with its principal place of business in Illinois, offers "specialized products and accessories, expert advice and professional service to recreational vehicle owners and campers" including "a full selection of new and used RVs for sale".[1]

19.     Currently, CWGS operates over 185 stores nationwide.[2]

20.     In the ordinary course of doing business with CWGS, current and former consumers and/or employees provide CWGS with sensitive, personal, and private information such as their:

- Name;

- Address;

- Phone number;

- Driver's license number;

- Social Security number;

- Date of birth;

- Email address;

- Passport number; and

- Financial account information for direct deposit of payment.

21.     The information held by CWGS in its computer systems and networks included the PII of Plaintiff and Class Members.

---

[1] https://www.campingworld.com/helpcenter#aboutUs (last accessed Nov. 28, 2022).
[2] *Id.*

22.     On information and belief, in the course of collecting Private Information from employees and consumers, including Plaintiff, CWGS promised to provide confidentiality and adequate security for employee data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

23.     CWGS made these promises in, among other things, its Privacy Policy available on its website.[3]

24.     Plaintiff and the Class Members, as former and current CGWS consumers and/or employees, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers and employees, in general, demand security to safeguard their PII, especially when Social Security numbers and other sensitive PII is involved.

25.     By obtaining, collecting, and using Plaintiff's and Class Members' PII, CWGS assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

***The Data Breach***

26.     According to the Notice of a Data Incident letter, CWGS discovered the Data Breach on or about February 9, 2022.

27.     Upon discovering the Data Breach, CWGS "engaged a forensic security firm to investigate and secure its computer systems", which "determined that an unknown third party accessed CWGS's systems from January 14, 2022 to February 13, 2022."

---

[3] https://www.campingworld.com/helpcenter-ourpolicies/privacyPolicy.html (last accessed Nov. 28, 2022).

28.     CWGS subsequently determined, only on July 20, 2022, that the "data contained some individuals' personal information" and that the "type of information at issue varied for each individual but may have included" a particular consumer's and/or employee's "name, date of birth, Social security number, driver's license number, state, federal, or foreign ID number, tax ID number, financial account number with and without account access information, debit/credit card number with and without CVV and/or expiration date, digital/electronic signature, and username and password."

29.     On or about November 3, 2022, CWGS began notifying current and former consumers, current and former employees, and state Attorneys General about the Data Breach.[4]

30.     In or about November 2022, Plaintiff Hoover received, by U.S. mail, a Notice of Data Incident letter, directly from CWGS, informing Plaintiff that her personal information, including her Social Security number, "may have been accessed and/or acquired from its systems as part of the incident".

31.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from CWGS that included the Private Information of Plaintiff and Class Members.

32.     CWGS failed to use encryption to protect sensitive information transmitted online, and unauthorized individuals accessed CWGS's customers' unencrypted, unredacted information, including name, address, email address, and payment card information, which includes payment card number, CVV code, expiration date, and possibly more.[5]

---

[4] https://oag.ca.gov/ecrime/databreach/reports/sb24-559009 (last accessed Nov. 28, 2022); https://apps.web.maine.gov/online/aeviewer/ME/40/cf468337-ba04-4eac-b5ff-5f8350fd9183.shtml (last accessed Nov. 28, 2022).

[5] It is clear that the information exposed in the Data Breach was unencrypted: California law requires companies to notify California residents "whose unencrypted personal information *was, or is reasonably believed to have been, acquired by an unauthorized person*" due to a "breach of the security of the system[.]" Cal. Civ. Code § 1798.82(a)(1) (emphasis added). Defendant notified the California Attorney General of the Data Breach in or about November 2022, evidencing that the exposed data was unencrypted. *See* https://oag.ca.gov/ecrime/databreach/reports/sb24-559009 (last accessed Nov. 28, 2022).

33. Plaintiff's Private Information was accessed and stolen in the Data Breach. Plaintiff believes her stolen Private Information, including her Social Security number along with her name, is currently available for sale on the Dark Web given the nature of the Data Breach.

34. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[6]

35. To prevent and detect the Breach, CWGS could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

---

[6]How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 17, 2022).

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[7]

36.     To prevent and detect the Breach, CWGS could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)…

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

---

[7] *Id.* at 3–4.

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic....[8]

37.    To prevent and detect the Breach, CWGS could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet Facing Assets**

-        Apply latest security updates
-        Use threat and vulnerability management
-        Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-        Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-        Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-        Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-        Monitor for adversarial activities
-        Hunt for brute force attempts

---

[8] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Oct. 17, 2022).

-    Monitor for cleanup of Event Logs
-    Analyze logon events;

**Harden infrastructure**

-    Use Windows Defender Firewall
-    Enable tamper protection
-    Enable cloud-delivered protection
-    Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[9]

38.     Given that CWGS was storing the PII of Plaintiff and Class Members, CWGS could and should have implemented all of the above measures to prevent and detect the Data Breach.

39.     The occurrence of the Data Breach indicates that CWGS failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of an undisclosed amount of current and former consumers and/or employees, including Plaintiff's and Class Members'.

40.     Due to the severity of the Data Breach, CWGS encouraged recipients to enroll in "one-year membership to Equifax Credit Watch Gold", a credit monitoring service.

41.     That CWGS is encouraging current and former consumers and/or employees to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals are subject to a substantial and imminent threat of fraud and identity theft.

42.     Plaintiff and Class Members provided their Private Information to CWGS with the reasonable expectation and mutual understanding that CWGS would comply with its obligations to keep such information confidential and secure from unauthorized access.

---

[9] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

43.     Indeed, CWGS's own Privacy Policy warrants that CWGS "appreciate[s] and value[s] the trust [consumers] place in CWGS".[10] More specifically, CWGS' Privacy Policy promises to "use a combination of physical, technical, and administrative safeguards. . . to safeguard [consumers'] personal information[.]"[11]

44.     CWGS had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

45.     CWGS also failed to give timely and accurate notice of the Data Breach. CWGS admits that the breach was discovered on February 9, 2022, and notice was not sent out until approximately November 3, 2022. Moreover, while CWGS contends that Plaintiff's and Class Members' information "may" have been accessed, that contention is belied by the fact of sending formal notice of the data breach, which is generally only required when there is more than a low probability that protected information was compromised. CWGS's notice is therefore misleading and incomplete, when it knows with reasonable certainty that Plaintiff's and Class Members' Private Information was accessed.

***Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII***

46.     CWGS has historically acquired, collected, and stored a massive amount the PII of Plaintiff and Class Members.

47.     As a condition of purchasing a product or service from CWGS, Defendant requires that consumers entrust it with highly sensitive information.

---

[10] https://www.campingworld.com/helpcenter-ourpolicies/privacyPolicy.html (last accessed Nov. 28, 2022)
[11] *Id.*

48.     Similarly, as a condition of employment, or as a condition of receiving certain benefits, CWGS requires that employees, former employees, and other personnel entrust it with highly sensitive information.

49.     By obtaining, collecting, and using Plaintiff's and Class Members' PII, CWGS assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

50.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on CWGS to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

51.     In demonstration of its understanding of data security's importance, CWGS's policies on its website include promises and legal obligations to maintain and protect PII.[12]

52.     CWGS could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members.

53.     Despite the prevalence of public announcements of data breach and data security compromises, CWGS failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

54.     CWGS's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

***The Data Breach was a Foreseeable Risk of Which Defendant Was on Notice***

55.     It is well known that PII—Social Security numbers in particular—is an invaluable commodity and a frequent target of hackers.

---

[12] https://www.campingworld.com/helpcenter-ourpolicies/privacyPolicy.html (last accessed Nov. 28, 2022).

56.     Individuals place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

57.     CWGS's data security obligations were particularly important given the substantial increase in data breaches targeting entities that collect and store PII, like CWGS, preceding the date of the breach.

58.     In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[13]

59.     The 525 reported breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[14]

60.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), CWGS knew or should have known that its electronic records would be targeted by cybercriminals.

61.     Indeed, data breaches, such as the one experienced by CWGS, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report

---

[13]https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed Oct. 17, 2022).
[14] *Id.* at p15.

14

explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

62.     CWGS knew and understood unprotected or exposed PII in the custody of recreational automotive dealerships, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

63.     At all relevant times, CWGS knew, or reasonably should have known, of the unique type and the significant volume of data on CWGS's server(s), amounting to potentially thousands of individuals' detailed PII, and the significant number of individuals who would be harmed by the exposure of the unencrypted data. Therefore, CWGS knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, driver's license numbers, and financial account information, and of the foreseeable consequences that would occur if CWGS's data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

64.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

65.     In the Notice Letter, CWGS makes an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple

---

[15]https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection  (last accessed Oct. 17, 2022).

years of ongoing identity theft, and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

66.     The injuries to Plaintiff and Class Members were directly and proximately caused by CWGS's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *At All Relevant Times CWGS Had a Duty to Plaintiff and Class Members to Properly Secure their Private Information*

67.     At all relevant times, CWGS had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to promptly notify Plaintiff and Class Members when CWGS became aware that their PII may have been compromised.

68.     CWGS's duty to use reasonable security measures arose as a result of the special relationship that existed between CWGS, on the one hand, and Plaintiff and the Class Members, on the other hand. The special relationship arose because Plaintiff and the Members of the Class entrusted CWGS with their PII as a condition of their purchase of a product or service and/or their employment with CWGS.

69.     CWGS had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

70.     CWGS's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because CWGS is bound by industry standards to protect confidential PII.

71.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

a.     Maintaining a secure firewall configuration;

b.     Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c.     Monitoring for suspicious or irregular traffic to servers;

d.     Monitoring for suspicious credentials used to access servers;

e.     Monitoring for suspicious or irregular activity by known users;

f.     Monitoring for suspicious or unknown users;

g.     Monitoring for suspicious or irregular server requests;

h.     Monitoring for server requests for PII;

i.     Monitoring for server requests from VPNs; and

j.     Monitoring for server requests from Tor exit nodes.

72.     CWGS had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, CWGS breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

73.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's

---

[16] 17. C.F.R. § 248.201 (2013.

17

license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

74.     The ramifications of CWGS's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### *Value of Personally Identifiable Information*

75.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[18] For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web. Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

76.     Social Security numbers, which were compromised for some of the Class Members as alleged herein including Plaintiff, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone

---

[17] *Id.*

[18] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[19] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[20] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

77.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number

78.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[22]

79.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[23]

80.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with

---

[21] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

[22] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Oct. 17, 2022).

[23] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[24]

81.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

82.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

83.     Given the nature of the Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

84.     The information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

85.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[24] See OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.
[25] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, name, and date of birth.

### *Defendant's Failure to Comply with FTC Guidelines*

86.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[26]

87.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[27] These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[28]

88.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[29]

89.     The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used

---

[26] Federal Trade Commission, *Start With Security*, *available at*: https://www.ftc.gov/system/files /documents/plain-language/pdf0205-startwithsecurity.pdf.

[27] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide- business.

[28] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).

[29] *Id.*

on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[30]

90.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

91.     Plaintiff and the other Class Members reasonably expected that when they provide PII to Defendant, CWGS would safeguard their PII.

92.     Because Class Members entrusted CWGS with their PII, CWGS had, and has, a duty to the Class Members to keep their PII secure.

93.     Upon information and belief, CWGS was at all times fully aware of its obligation to protect the personal and financial data of consumers and/or employees, including Plaintiff and Members of the Class. CWGS was also aware of the significant repercussions if it failed to do so.

94.     CWGS's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer and/or employee data—including Plaintiff's and Class Members' Social Security numbers and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[30] FTC, *Start With Security*, *supra* note 18.

*Defendant's Failure to Comply with Industry Standards*

95.     As noted above, experts studying cyber security routinely entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

96.     Several best practices have been identified that a minimum should be implemented by companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. CWGS failed to follow these industry best practices, including a failure to implement multi-factor authentication.

97.     Other best cybersecurity practices that are standard in the recreational vehicle industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. CWGS failed to follow these cybersecurity best practices, including failure to train staff.

98.     CWGS failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

99.     These foregoing frameworks are existing and applicable industry standards in the recreational vehicle industry, and upon information and belief, CWGS failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES AND DAMAGES

100.     As a result of CWGS's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their PII , which remains in the possession of CWGS, and which is subject to further breaches, so long as CWGS fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Plaintiff's and Class Member's Risk of Identity Theft*

101.     The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff

and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

102.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

103.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

104.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

105.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud.

Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

106.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as CWGS's Notice Letter encourages, enroll in credit-monitoring services and monitor their financial accounts generally for many years to mitigate the risk of identity theft.

107.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

108.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[31]

109.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

---

[31] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[32] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

110.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[33]



111.    And for those Class Members who experience actual identity theft and fraud, the GAO Report noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[34]

---

[33] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).

[34] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

### *Diminution of Value of PII*

112.    PII is a valuable property right.[35] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

113.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[36]

114.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[37] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[38][39] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[40]

115.    As a result of the Data Breach, Plaintiff's and Class Members' PI, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.

---

[35] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[36] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[37] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[38] https://datacoup.com/

[39] https://digi.me/what-is-digime/

[40] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

116. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., Social Security numbers and names.

117. Driver's license numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[41]

118. According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.[42]

119. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless

---

[41] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last accessed July 20, 2021)
[42] Sue Poremba, *What Should I Do If My Driver's License Number is Stolen?"* (October 24, 2018) (last accessed July 20, 2021)

piece of information to lose if it happens in isolation."[43] However, this is not the case. As cybersecurity experts point out:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.[44]

120.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[45]

121.    At all relevant times, CWGS knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if CWGS's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

122.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII .

123.    CWGS was, or should have been, fully aware of the unique type and the significant volume of data on CWGS's network, amounting to potentially millions of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[43]https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed July 20, 2021)
[44] *Id.*
[45]*How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021 https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last accessed July 20, 2021)

124.     The injuries to Plaintiff and Class Members were directly and proximately caused by CWGS's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

125.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII, reports of misuse of Class Member PII discussed below, and reports of dissemination on the Dark Web also discussed below, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

126.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

127.     Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

128.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from CWGS's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for CWGS's failure to safeguard their PII.

### *Loss of Benefit of the Bargain*

129.     Furthermore, CWGS's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay CWGS for products or accepting employment from CWGS under certain terms, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the PII, when in fact, CWGS did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with CWGS.

### *Plaintiff Hoover's Experience*

130.     Plaintiff Hoover purchased a recreational vehicle ("RV") from Grumbine's RV, a Harrisburg based RV retailer, in 2001. To obtain a loan for this RV, she was required to disclose her Personal Information, which was then maintained by Gumbine's RV.

131.     Grumbine's RV was located at 7501 Allentown Blvd., Harrisburg, Pennsylvania. In 2004, Grumbine's RV was acquired by Camping World, and in 2015 Grumbine's RV was rebranded as a Camping World outlet.[46]

132.     Camping World continued to maintain Plaintiff Hoover's information, without her knowledge.

133.     On approximately November 7, 2022, Plaintiff Hoover received a letter from CWGS notifying her of the Breach. The letter disclosed that, on July 20, 2022, CWGS determined that the information lost in the Breach included her name, as well as her Social Security number.

---

[46] *Grumbine's RV Center rebranding as Camping World of Harrisburg*, CENTRAL PENN BUSINESS JOURNAL (Apr. 15, 2015), https://www.cpbj.com/grumbines-rv-center-rebranding-as-camping-world-of-harrisburg/.

134.    The letter did not explain how CWGS had acquired her information, nor why it had held onto the Private Information for so long.

135.    As a result of CWGS's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff Hoover and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their PII, which remains in the possession of CWGS, and which is subject to further breaches, so long as CWGS fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

## CLASS ALLEGATIONS

136.    This action is brought by the named Plaintiff on her own behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rule of Civil Procedure 23, which is defined as follows:

> All persons whose Private Information was compromised as a result of the Data Breach that CWGS discovered on or about February 9, 2022.

137.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

138.    Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

139.    <u>Numerosity.</u> The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class Members is unknown at this time, there are over 30,000 persons impacted according to the Maine Attorney General.[47] Moreover, it is generally ascertainable by appropriate discovery and is in the exclusive control of CWGS.

140.    <u>Commonality.</u> Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)      Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b)      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c)      Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d)      Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

f)      Whether Defendant breached their duty to Class Members to safeguard their Private Information;

---

[47] https://apps.web.maine.gov/online/aeviewer/ME/40/cf468337-ba04-4eac-b5ff-5f8350fd9183.shtml (last accessed Nov. 28, 2022).

g)     Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h)      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i)      Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

k)      Whether Defendant breach an implied contract between it and the Plaintiff;

l)      Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

141.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

142.    <u>Adequacy</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

143.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

144.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

145. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

146. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b) Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c) Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d) Whether Defendant failed to take commercially reasonable steps to safeguard conumer Private Information; and

36

e) Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach

147.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On behalf of Plaintiff and the Class)**

148.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 147 above as if fully set forth herein.

149.    CWGS required Plaintiff and Class Members to submit sensitive, non-public, personal information in order to purchase a product or service from CWGS or to be employed by CWGS.

150.    CWGS knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

151.    CWGS owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, policies, and procedures, and the personnel responsible for them, adequately protected the PII.

152.    CWGS owed a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII.

153.    CWGS owed a duty of care to safeguard the PII due to the foreseeable risk of a data breach and the severe consequences that would result from its failure to so safeguard the PII

154.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, CWGS had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it— to prevent disclosure of the information, and to safeguard the information from theft. CWGS's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

155.    CWGS also had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair. . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

156.    CWGS's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because CWGS is bound by industry standards to protect confidential PII.

157.    CWGS had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

158.    The imposition of a duty of care on CWGS to safeguard the PII it maintained is appropriate because any social utility of Defendant's conduct is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

159. CWGS breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by CWGS include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b. Failing to adequately monitor the security of their networks and systems;

    c. Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

    d. Allowing unauthorized access to Class Members' PII;

    e. Failing to detect in a timely manner that Class Members' PII had been compromised; and

    f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

160. It was foreseeable that CWGS's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

161. CWGS's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised.

162. As a result of CWGS ongoing failure to notify Plaintiff and Class Members regarding the type of PII has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

163.    CWGS's breaches of duty caused Plaintiff and Class Members to suffer from loss of time and money to monitor their finances for fraud, and loss of control over their PII.

164.    As a result of CWGS negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their PII, which is still in the possession of third parties.

165.    CWGS's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and unsecure manner.

166.    Plaintiff seeks the award of actual damages on behalf of herself and the Class.

167.    In failing to secure Plaintiff's and Class Members' PII and promptly notifying them of the Data Breach, CWGS is guilty of oppression, fraud, or malice, in that CWGS acted or failed to act with a willful and conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, therefore, in addition to seeking actual damages, seeks punitive damages on behalf of herself and the Class.

168.    Plaintiff seeks injunctive relief on behalf of the Class in the form of an order compelling CWGS to institute appropriate data collection and safeguarding methods and policies with regard to customer and employee information.

## COUNT II
### BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

169.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 168 above as if fully set forth herein.

170.    Plaintiff and Class Members were required to provide their PII to CWGS as a condition of purchasing a product from CWGS and/or to be employed by CWGS.

171.     Plaintiff and Class Members provided their labor and/or payments for products or services to CWGS in exchange for (among other things) CWGS's promise to protect their PII from unauthorized disclosure.

172.     When Plaintiff and Class Members provided their PII to CWGS in exchange for CWGS's products and/or services or employment at CWGS, they entered into implied contracts with CWGS pursuant to which CWGS agreed to reasonably protect such information and to destroy any PII that it was no longer required to maintain.

173.     In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that CWGS's data security practices complied with relevant laws and regulations and were consistent with industry standards.

174.     Plaintiff and Class Members would not have entrusted their PII to CWGS in the absence of the implied contract between them and CWGS to keep their information reasonably secure.

175.     Plaintiff and Class Members would not have entrusted their PII to CWGS in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

176.     In its written privacy policies, CWGS expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

177.     CWGS further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

178.      There was a meeting of the minds and an implied contractual agreement between Plaintiff and Class Members and CWGS, under which Plaintiff and Class Members would provide

their PII in exchange for CWGS's obligations to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

179. CWGS solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted CWGS's offers and provided their PII to CWGS.

180. In accepting the PII of Plaintiff and Class Members, CWGS understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

181. Plaintiff and Class Members would not have entrusted their PII to CWGS in the absence of the implied contract between them and CWGS to keep their information reasonably secure. Plaintiff and Class Members would not have entrusted their PII to CWGS in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

182. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with CWGS.

183. CWGS breached their implied contracts with Class Members by failing to safeguard and protect their PII or to destroy it once it was no longer necessary to retain the PII.

184. As a direct and proximate result of CWGS's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

185.     Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

186.     Plaintiff and Class Members are also entitled to injunctive relief requiring CWGS to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT III
### BREACH OF FIDUCIARY DUTY
### (On behalf of Plaintiff and the Class)

187.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 186 above as if fully set forth herein.

188.     In light of the special relationship between Defendant and Plaintiff and Class Members, whereby CWGS became a guardian of Plaintiff's and Class Members' PII, CWGS became a fiduciary by its undertaking and guardianship of the PII, to act primarily for the benefit of its customers and/or employees, including Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a data breach and disclosure; and (3) maintain complete and accurate records of what private information (and where) CWGS did and does store.

189.     CWGS's fiduciary duty to safeguard Plaintiff's and Class Members' from the contracts that the customers and/or employees entered into with CWGS, to which CWGS agreed to reasonably protect such information and to destroy any PII that it was no longer required to maintain.

190.     CWGS had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of this relationship, in particular, to keep secure the PII of its customers and employees.

191.     CWGS breached its fiduciary duties to Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII.

192.     CWGS breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the IT systems containing Plaintiff's and Class Members' PII.

193.     CWGS breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely and adequately notify Plaintiff and Class Members of the Data Breach.

194.     As a direct and proximate result of CWGS's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the compromise, publication, and/or theft of their PII; (ii) out-of- pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iii) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (iv) the continued risk to their PII, which remains in CWGS's possession and is subject to further unauthorized disclosures so long as CWGS fails to undertake appropriate and adequate measures to protect the PII in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (v) the diminished value of CWGS's services they received.

195.    As a direct and proximate result of CWGS's breaching its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

196.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 195 above as if fully set forth herein.

197.    Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of monies paid for the purchase of products from Defendant prior to and during the period of the Data Breach.

198.    Defendant appreciates or has knowledge of the benefits conferred directly upon it by Plaintiff and the Class Members.

199.    The monies paid by Plaintiff and the Class Members to Defendant prior to and during the period of the Data Breach were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and the Class Members.

200.    Defendant failed to provide reasonable security, safeguards, and protection for the PII of Plaintiff and Class Members and, as a result, Plaintiff and Class Members overpaid Defendant for the products purchased.

201.    Had Plaintiff and the Class known that Defendant would not adequately protect their PII, they would not have elected to purchase products from Defendant or would have paid less for the same.

202.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and the Class Members, because Plaintiff and Class Members paid for adequate safeguards and security measures to protect their PII that Defendant did not provide.

203.    Plaintiff and the Class have conferred directly upon Defendant an economic benefit in the nature of monies received and profits resulting from sales and unlawful overcharges to the economic detriment of Plaintiff and the Class Members.

204.    The economic benefit, including the monies paid and the overcharges and profits derived by Defendant and paid by Plaintiff and the Class Members, is a direct and proximate result of Defendant's unlawful practices as set forth in this Complaint.

205.    The financial benefits derived by Defendant rightfully belong to Plaintiff and the Class Members.

206.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and the Class.

207.    Plaintiff and the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class, respectfully requests that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as Class Counsel;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and

Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

d)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)  Ordering Defendant to pay for not less than five (5) years of credit monitoring services for Plaintiff and the Class;

f)  For an award of actual damages, compensatory damages, nominal damages, statutory damages, in an amount to be determined, as allowable by law;

g)  For an award of punitive damages, as allowable by law;

h)  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i)  Pre- and post-judgment interest on any amounts awarded; and

j)  Such other and further relief as this court may deem just and proper.

Dated: January 24, 2023                   Respectfully submitted,

                                          /s/ *Gary M. Klinger*
                                          Gary M. Klinger
                                          **MILBERG COLEMAN BRYSON**
                                          **PHILLIPS GROSSMAN, LLC**
                                          227 W. Monroe Street, Suite 2100
                                          Chicago, IL 60606
                                          Telephone: 866.252.0878
                                          gklinger@milberg.com

Nicholas A. Migliaccio
Jason Rathod
**MIGLIACCIO & RATHOD, LLP**
412 H Street NE
Washington, D.C. 20002
Tel: 202.470.3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 24, 2023, the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.


*/s/ Gary M. Klinger*
Gary M. Klinger